# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | Case No. 2:24-cr-0040-NT |
| **ALBERTO REBOLLAR OSORIO** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States of America ("the Government") submits this response in opposition to Defendant Alberto Rebollar Osorio's Motion to Dismiss. *See* ECF No. 22. In his motion, the defendant argues that the criminal offense that he is facing, Possession of Firearm by Alien Illegally or Unlawfully in the United States under 18 U.S.C. §§ 922(g)(5) and 924(a)(8), is facially unconstitutional and unconstitutional as applied. Defendant argues he is one of "the people" envisioned by the Second Amendment, and that there is no historical tradition of regulating firearms as it pertains to non-citizens/immigrants. However, nothing in the Supreme Court's recent Second Amendment jurisprudence, all of which concerned restrictions on the ability of law-abiding citizens to keep and bear arms, should cast doubt on the federal government's ability to prohibit undocumented immigrants like the Defendant from possessing a firearm, or cause this Court to reconsider the consensus of appellate courts upholding the constitutionality of Section 922(g)(5)(A)'s restriction on undocumented immigrants' firearm possession. As such, this Court should deny Defendant's motion.

## I.     Background

On February 28, 2024, the grand jury returned a true bill charging Defendant Rebollar Osorio with one count of Possession of Firearm by Alien Illegally or Unlawfully

in the United States in violation of 18 U.S.C. § 922(g)(5) and 924(a)(8). ECF No. 16. Underlying the Indictment, Rebollar Osorio was stopped by an Oxford County Sheriffs Office Deputy for speeding while driving a vehicle along Route 16 in Adamstown Township, Maine. In the course of the traffic stop, Rebollar Osorio informed the deputy that he was not legally in the United States. An agent with the U.S. Border Patrol subsequently arrived on scene. The deputy told Rebollar Osorio that the vehicle would have to be towed away from the scene and asked if there was anything the deputy needed to be worried about inside the vehicle, to include weapons or drugs. Rebollar Osorio informed law enforcement he kept a firearm inside of his backpack and pointed toward the vehicle. The deputy subsequently retrieved a Kel-Tec .380 handgun from a backpack located inside the vehicle, as well as loose .380 caliber ammunition in the center console and a set of brass knuckles in the door handle. Rebollar Osorio was placed into custody. Further speaking to U.S. Border Patrol, Rebollar Osorio indicated that he had illegally entered into the United States approximately eleven years prior near McAllen, Texas. At the time that he was encountered by the Sheriff's deputy and Border Patrol, Rebollar Osorio had no prior criminal history.

### II. Legal Argument

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. *Id.* at 635. The Court cautioned, however, that the right to keep and bear arms "is not unlimited"

and that the right remains subject to "presumptively lawful regulatory measures." *Id.*at 626, 627 n.26.

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Court again considered the meaning of the Second Amendment as it pertained to a New York licensing scheme allowing authorities to deny concealed carry permits even to those individuals meeting the proscribed threshold criteria. In so doing, the Court directed lower courts to ask two questions when evaluating what limitations Congress can impose on citizens' Second Amendment rights. First, a court must consider whether "the Second Amendment's plain text covers an individual's conduct," and if it does, then whether "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. Under those circumstances, "the government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

Here, following the guidance provided by *Bruen*, Section 922(g)(5) remains a permissible restriction on firearms possession unencumbered by the Second Amendment. Under *Bruen*'s first line of inquiry, unlawful non-citizens do not fall within the textual purview of the Second Amendment, and, even if they did, Section 922(g)(5) remains constitutionally permissible under *Bruen*'s second line of inquiry given the statute is consistent with the historical regulation of firearms. Since *Bruen*, the Supreme Court has not addressed the constitutionality of Section 922(g)(5), and neither has the First Circuit. However, the Eighth Circuit Court of Appeals and several district courts have found Section 922(g)(5) constitutional post-*Bruen* upon a review of text, history,

and precedent, or a combination of the three. *See United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023); *United States v. Pierret-Mercedes*, No. 22-CR-430, 2024 WL 1672034 (D. P.R. Apr. 18, 2024); *United States v. Leveille*, 659 F.Supp.3d 1279 (D. N.M. Mar. 7, 2023) *United States v. Gil-Solano*, No. 23-CR-18, 2023 WL 6810864 (D. Nev. Oct 16, 2023); *United States v. Pineda-Guevara*, No. 23-CR-2, 2023 WL 4943609 (S.D. Miss. Aug. 2, 2023); *United States v. Escobar-Temal*, No. 22-CR-393, 2023 WL 4112762 (M.D. Tenn. June 21, 2023); *United States v. DaSilva*, No. 21-CR-267, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022).

### A. The Second Amendment Right Belongs to United States Citizens

The first step of *Bruen*'s two-step framework – an analysis of whether the challenged law regulates activity falling within the text of the Second Amendment – is "broadly consistent with *Heller*." 597 U.S. at 19. To date, every court of appeals to consider Section 922(g)(5)'s constitutionality under *Heller* has held the statute to be constitutional. *See, e.g., United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert denied*, 142 S. Ct. 1133 (2022)[1]; *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015); *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). As such, to the extent the Court can find Section 922(g)(5) consistent with *Heller*, it can do so under *Bruen* as well.

First, under the reasoning of *Bruen*, the Second Amendment's plain text does not cover the conduct of unlawful non-citizens like Rebollar Osorio. The Second

---

[1]     Notably, the Supreme Court denied Perez's petition for certiorari, in which Perez expressly asked the Court to hold the petition pending its decision in *Bruen*. Thus, the Court declined the opportunity to vacate and remand for further consideration in light of *Bruen*.

Amendment, by its terms, protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *Heller*, the Supreme Court determined that "the Second Amendment right is exercised individually and belongs to all *Americans*." 554 U.S. at 581 (emphasis added). The opinion likewise reflects the understanding that the right to keep and bear arms belongs to "citizens" who are "law-abiding". *See id.* at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right"); *id.* at 608 (right "enjoyed by the citizen" (citation omitted)); *id.* at 613 ("citizens ha[ve] a right to carry arms"); *id.* at 625 ("weapons not typically possessed by law-abiding citizens"); *ibid.* ("possession of firearms by law-abiding citizens"); *id.* at 635 ("law abiding, responsible citizens").

Subsequent Supreme Court cases similarly identified the right as belonging to law-abiding citizens. *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010) ("Thus, we concluded, citizens must be permitted 'to use [handguns] for the core purpose of lawful self-defense.'" (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*)); *Bruen*, 597 U.S. at 8-9 ("In [*Heller*] and [*McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* at 9 ("ordinary, law-abiding citizens"); *id.* at 29 (framing appropriate historical analogies as comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 31-32 ("It is undisputed that petitioners Koch and Nash – two ordinary, law-abiding, adult citizens – are part of 'the people' whom the Second Amendment protects."); *id.* at 60 ("law abiding citizens"); *id.* at 71 ("law-abiding citizens"); *id.* at 78 (Alito, J., concurring) ("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun."). Undocumented immigrants are not "part of

5

'the people' to whom the protections of the Second Amendment extend," *Sitladeen*, 64 F.4th at 987, because they have "show[n] a willingness to defy our law" by entering or remaining in the United States illegally. *Perez*, 6 F.4th at 456. Accordingly, this Court should conclude that undocumented immigrants are not law-abiding citizens protected by the Second Amendment. *See* Sitladeen, 64 F.4th at 987.

Rebollar Osorio sidesteps the Supreme Court's repeated emphasis that the Second Amendment right belongs to law-abiding citizens by pointing to *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) and discussion regarding the same in *Heller*. Pertinently, the *Heller* Court quoted *Verdugo-Urquidez* and stated:

> "The people" seems to have been a term of art employed in select parts of the Constitution . . . Its uses suggest that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

*Heller*, 554 U.S. at 580 (*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)) (cleaned up). However, immediately preceding the quoted language, the Supreme Court explained that "the term ['the people'] unambiguously refers to all members of the *political community*." *Heller*, 554 U.S. at 580 (emphasis added); *see also United States v. Huitron-Guizar*, 678 F.3d at 1168 (10th Cir. 2012) (noting the Supreme Court's substitution of 'political' community for 'national' community in *Heller* and stating "it is not exactly reading between the lines to note how frequently the opinion connected arms-bearing and citizenship"). The "political community," through its elected representatives, has excluded undocumented immigrants such as Rebollar Osorio from its membership:

> "That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office, U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(1), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a)."

*Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982) (observing that "citizenship . . . determin[es] membership in the political community" and that "[a]liens are by definition . . . outside of this community."). Thus, "[i]llegal aliens are not 'law-abiding, responsible citizens' or . . . 'members of the political community' – that is, 'the people' – who may invoke the Second Amendment." *Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment) (quoting *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), and *Heller*, 554 U.S. at 580).

As alleged in the Indictment, Defendant Rebollar Osorio is not an American citizen and, by virtue of his undocumented status, is also not law-abiding. Per *Bruen*'s definition of the Second Amendment's plain text, and rulings from a majority of courts of appeals, Rebollar Osorio's possession of a firearm is constitutionally unprotected. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043-47 and 1050 (11th Cir. 2022) (concluding after a review of the Second Amendment's "text and history" that illegal aliens "do not enjoy the right to keep and bear arms"); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (discussing *Heller*, *Verdugo-Urquidez*, and the historical record at length before concluding "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (holding that "the protections of the Second Amendment do not extend to aliens

illegally present in this country"); *Portillo-Munoz*, 643 F.3d at 442 ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally present in the United States."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community"), *cert denied*, 141 S. Ct. 2671 (2021); *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 669-72 (7th Cir. 2015) (concluding that the defendant was among "the people" but upholding § 922(g)(5)(A) on other grounds). While these cases were decided pre-*Bruen*, the *Bruen* court notably emphasized that the scope of the Second Amendment extended only to "Americans" and "law-abiding citizens."

Section 922(g)(5)(A) disarms noncitizens who are unlawfully present in the United States. Such persons, by definition, are not "law-abiding, responsible citizens" protected by the Second Amendment and thereby the statute falls outside the scope of the plain text of the Second Amendment. *Heller*, 554 U.S. at 635. Accordingly, even if Rebollar Osorio has a more substantial connection with the United States than other undocumented immigrants, *see* ECF No. 22, he cannot invoke the protections of the Second Amendment. On that basis, the Court should deny the motion to dismiss.

**B. Section 922(g)(5) is Consistent with This Nation's Historical Tradition of Firearms Regulation**

Assuming the Second Amendment applies at all, it permits limitations on the right to keep and bear arms that are "fairly supported by . . . historical tradition." *Heller*, 554 U.S. at 627; *see e.g.*, *id.* at 626-27 & n.26 (emphasizing that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill," and stating that these "presumptively lawful regulatory measures" were identified "only as examples" and not as an "exhaustive" list). The Supreme Court confirmed in *Bruen* that, even where the plain text of the Second Amendment applies, the government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 102.

*Bruen* contemplated two avenues of historical inquiry. The first, applied in *Bruen* itself, is what the Supreme Court described as a "straightforward historical inquiry" which applies when "a challenged regulation addresses a general societal problem has persisted since the 18th century." *Id.* at 26-27. The Court affirmed that firearms regulations that are direct progeny of those at the relevant historical period are permissible. *Id.* The second avenue of inquiry *Bruen* directed is by "historical analog[y]." *Id.* at 27. Courts may "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by determining "whether the two regulations are relevantly similar." *Id.* at 28-29. Under either avenue, Rebollar Osorio's challenge to Section 922(g)(5) fails.

1. **Section 922(g)(5)(A) is consistent with the relevant historical practice around firearms regulation.**

Section 922(g)(5)(A) is consistent with, and similar to, relevant historical practice around firearms regulation. The historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens – and, indeed, only to specific categories of citizens – at the time of its ratification.

Under the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," the right to keep and bear arms was expressly

limited to "Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id.* ("By the time of the founding, the right have arms had become fundamental for English *subjects*." (emphasis added)). And in colonial America,

> [T[he right to keep and bear arms "did not extent to all New World residents." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1996). While "[a]lien men . . . could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998).

*Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted);

*accord Jimenez-Shilon*, 34 F.4th at 1046-47:

> The individual right to bear arms enshrined in the English Declaration of Rights – which "has long been understood to be the predecessor to our Second Amendment" – was not made "available to the whole population." *Heller*, 554 U.S. at 593, 128 S.Ct. 2783. Instead, it was limited to the "Subjects which are Protestants, ... suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). We have found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose relationships to the sovereign mirrored that of American "citizens." Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry. *See, e.g.*, Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015). And the English common law simultaneously made it such that "aliens [were] incapacitated to hold lands." *Bayard v. Singleton*, 1 N.C. 5, 9 (1787) *1047 (emphasis omitted); *see Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 323-24, 2 L.Ed. 634 (1808); Blackstone, *supra*, at *372.

*See also Carpio-Leon*, 701 F.3d at 980 ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous.").

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community/citizenry who swore allegiance to the United States. Massachusetts and Virginia forbade the arming of Native Americans, *see* Malcolm, *supra*, at 140, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).

Similarly, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments ... framed their police power to disarm around a test of allegiance."). And, during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *accord Jimenez-Shilon*, 34 F.4th at 1049.

The founding era sources on which courts have relied in defining the contours of the Second Amendment, such as the Bill of Rights, make clear that the Founders understood the right to bear arms as being connected with citizenship and membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary powers of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 J. Story, 3038 *Commentaries on the Constitution of the United States* § 1890, p. 746 (1833)) (emphasis added)).

In addition, the Second Amendment is connected to the concept of "a well regulated Militia." U.S. Const. amend. II. However, "the conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 627 (emphasis added). *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon*, 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 597 U.S. at 30 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

Accordingly, Section 922(g)(5)(A) disarms non-citizens who are unlawfully present in the United States. The statute does not "burden a law-abiding citizen's right to armed self -defense" in a manner inconsistent with historical precedent. *Bruen*, 597 U.S. at 29. Rather, the statute fits squarely within the historical tradition limiting Second Amendment rights to particular classes of law-abiding citizens. Rebollar Osorio is not part of this class.

## 2. Section 922(g)(5)(A) is sufficiently analogous to historic exclusions to firearms possession.

Rebollar Osorio argues that the government cannot meet its burden to establish the requisite historical tradition because "there were no firearm prohibitions for immigrants until the 1920s," and "even the laws surrounding immigration . . . were sparse." ECF No. 22, at 7, 8. Even if Section 922(g)(5) is not expressly derivative of the historic exclusions described above (and the government maintains that it is), the statute is still sufficiently analogous, per *Bruen*'s direction to apply analogous precedents, to early gun restrictions to support the conclusion that the possession of firearms by unlawful non-citizens is not part of this country's historical tradition and is therefore unprotected under the Second Amendment.

*Bruen*'s call for analogical reasoning requires only that the government identify a well-established and representative historical analogue, not "a historical twin." 597 U.S. at 30. A modern-day regulation may pass constitutional muster even where it is not identical to historical precursors, provided it is analogous enough. While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century. *See United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1036 (E.D. Wash. Feb. 18, 2022) ("The federal government first forayed into the realm

of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years.") (citing Supreme Court cases that upheld the exclusion law on the basis that illegal immigrants could be removed at any time); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/explore-agency-history/overview-of-agency-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and 19th centuries, and rarely questioned that policy until the late 1800s."). Given the country initially drew no connection between the manner of an immigrant's arrival and lawbreaking, there was no need to explicitly restrict any immigrant's possession of firearms. When viewed in light of the colonial restrictions on firearms, the laws prohibiting illegal immigrants from bearing arms that followed close on the heels of the existence of illegal immigrants suggest a long-standing understanding that the Second Amendment does not extend to such individuals. As the problem of *illegal* immigration emerged, "Congress ha[d] every right to conclude that those who how a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them." *Perez*, 6 F.4th at 456; *see also Mez-Rodriguez*, 798 F.3d at 673 (recognizing that "unauthorized noncitizens" are more "difficult to track" and "have an interest in eluding law enforcement").

Section 922(g)(5)(A) plainly does not prohibit firearm possession by all immigrants, but rather prohibits immigrants "illegally or unlawfully in the United States" from shipping, transporting, possessing, or receiving any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(5)(A). The *Bruen*

Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. Given that illegal immigration is an issue that substantially postdates the Second Amendment, the Government need not identify "a dead ringer for historical precursors," but rather must identify only "a well-established and representative historical analogue." *Id.* at 30. Pointing to the laws and traditions barring Native Americans, Catholics, and others that did not take an oath of allegiance from bearing arms, the Government has provided such an analogue. While some of the classifications – such as those based on race or religion - may be abhorrent and "would be unconstitutional today" under other constitutional provisions, *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3rd Cir. 2021) (quotation marks omitted), they nevertheless demonstrate that the right to bear arms was understood to be subjected to the government's limitation of that right to those within the political community, i.e., law-abiding citizens.

> "Today's immigration system functions as an attempt to define the nation's members and nonmembers. Certainly, any number of examples prove that this metric is flawed: controversy abounds over noncitizens brought here without authorization as infants, who have only known a home in this nation, and who nonetheless frequently face difficulties in attaining lawful citizenship despite clear loyalty to the United States. There are many others who would gladly take the opportunity to become Americans if a pathway to legitimate residency or citizenship existed for them. Alternatively, there are natural-born citizens, national 'insiders,' who feel no loyalty to their nation and wish it as much harm as any foreign terrorist might. But at its base, the current immigration laws are the imperfect system the United States has set up as a proxy for national allegiance. A history of laws restricting firearm ownership for individuals who refuse to swear allegiance to the United States is analogous to laws directed at undocumented immigrants – not perfectly so, because many

undocumented immigrants do not so much *refuse* as lack any legitimate opportunity to swear such an oath, but analogous nonetheless."

*United States v. Leveille*, 659 F. Supp. 3d 1279, at 1284-85 (D. N.M. Mar. 7, 2023) (citing *Bruen*, 142 S. Ct. at 2133).

Even if this Court were to find that Rebollar Osorio, as a non-law-abiding and undocumented noncitizen, is among "the people" to whom the Second Amendment guarantees the right to bear arms, Section 922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants is consistent with, and analogous to, this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community.

## CONCLUSION

WHEREFORE, the Government respectfully requests that the Court deny the defendant's motion to dismiss.


Dated: June, 6, 2024                     Respectfully submitted,

                                         DARCIE N. MCELWEE
                                         United States Attorney


                                         */s/ Peter I. Brostowin*
                                         Peter I. Brostowin
                                         Assistant U.S. Attorney
                                         United States Attorney's Office
                                         100 Middle Street, 6th Floor, East Tower
                                         Portland, ME 04101
                                         (207) 780-3257

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 6, 2024, I electronically filed the Government's

Response in Opposition to Defendant's Motion to Dismiss with the Clerk of Court using

the CM/ECF system, which will send notification of such filing (s) to the following:

Caleigh Milton, Esq.
Counsel for Defendant

DARCIE N. MCELWEE
UNITED STATES ATTORNEY

/s/ Peter I. Brostowin
Peter I. Brostowin
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
6th Floor, East Tower
Portland, ME 04101
Peter.Brostowin@usdoj.gov